UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |
|---|---|
| **SCOTT ELSEROAD, EVAN DOROSHEFF, DAVID ESTEY, JONATHAN SCHMIDT, DARRICK THOMPSON, RYAN DISHMAN, BRENT MILLS, MONALISA BOJORQUEZ, GIL REFAEL,** and **BEN LUCKADOO,** individually and on behalf of all others similarly situated, | Case No. 1:23-cv-01449 |
| Plaintiffs, | |
| v. | |
| **BOSTON FOUNDRY, INC.,** d/b/a **MADE IN COOKWARE,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiffs Scott Elseroad, Evan Dorosheff, David Estey, Jonathan Schmidt, Darrick Thompson, Ryan Dishman, Brent Mills, Monalisa Bojorquez, Gil Refael, and Ben Luckadoo ("Plaintiffs"), by and through their attorneys of record, upon personal knowledge as to their own acts and experiences, and upon the investigation of counsel and information and belief as to other matters, file this complaint against Boston Foundry, Inc., d/b/a Made In Cookware ("MIC" or "Defendant") and allege the following:

**INTRODUCTION**

1.      This is a proposed class action against MIC for misleading consumers through its marketing related to MIC cookware products, including claims related to the cookware being "non-toxic" or "free from" certain chemicals.

2.      In recent years, consumers have become increasingly concerned about using products that are cleaner and safer for humans, animals, and the environment.  As a result,

consumers are demanding products that are made from more natural ingredients and are environmentally sounder, including products that cause less harm to the environment through the product's materials, manufacture, use, or disposal.  Indeed, consumers have poured billions of dollars into the "ecofriendly" products market.[1]

3.     In a recent report, researchers found that members of "Generation Z" (people born between roughly 1996 and 2010) are more likely to spend money on companies and brands seen to be environmentally ethical.[2]  Another report, Nielson's Global Corporate Sustainability Report, found that 66% of consumers will spend more on a product if it comes from a sustainable brand, and that jumps to 73% among millennials.  Therefore, companies have a financial incentive to be more environmentally conscious, or at least appear to be.[3]

4.     This consumer movement toward environmentally friendly products is generally called the "green" movement.  Some companies, like Defendant, deceptively market their products as environmentally friendly to profit off this growing green movement without *actually* going green.  This is known as "greenwashing." "Greenwashing" generally describes the act of companies misleading consumers regarding the company's environmental practices or the environmental benefits of its products or services. Greenwashers do not make notable efforts toward an environmentally friendly marketplace, certainly not to the extent that they frequently claim.[4]

5.     MIC claims that their products are free from perfluorooctanoic acid (PFOA), one of a number of perfluoroalkyl and polyfluoroalkyl substances (PFAS) "forever chemicals," while

---

[1] https://www.foodbusinessnews.net/articles/13133-sustainable-product-market-could-hit-150-billion-in-us-by-2021
[2] https://earth.org/what-is-greenwashing/.
[3] *Id.*
[4] https://www.businessnewsdaily.com/10946-greenwashing.html.

also admitting they are coated with polytetrafluoroethylene (PTFE) and marketing PTFE as safe and inert.  The PTFE compound found in the non-stick coating of MIC cookware is a fluoropolymer plastic compound that is silicone based and contains both carbon and fluorine.[5] PTFE is also part of the PFAS chemical family and has been designated as such under California law and proposed as a banned PFAS in EU.[6],[7] Despite a lack of research on the impacts of PTFE, the primary difference between PTFE and other PFAS, like PFOA, is the number of carbon atoms chained together in the molecular structure.  PTFE contains several thousands of carbon atoms chained together and called a polymer.  Other PFAS, like PFOA, only consist of seven to fourteen carbon atoms and are short chained.[8]

6.      PFAS chemicals, such as PFOA and PTFE, "are very stable and don't interact much with other chemicals, so they can be helpful in making products that resist oils, stains, water, and heat."[9]  These chemicals raise health and environmental concerns "because they don't break down easily and can stay in the environment and in the human body for a long time (which is why they are sometimes referred to as 'forever chemicals')."[10]

7.      California recently took some lawmaking action against the cookware industry for making "free from" or PFAS-related claims about pots, pans, and other cookware. Pursuant to the California Safer Food Packaging & Cookware Act of 2021, cookware marketed to or sold to

---

[5] https://www.stonefryingpans.com/non-stick-frying-pan-health-risks/.

[6] *California Requires New Cookware Chemical Labeling Requirements by January 1st*, JDSupra, Nov. 30, 2022, https://www.jdsupra.com/legalnews/california-requires-new-cookware-2459164/ (last visited Nov. 3, 2023).

[7] *Is PTFE (Teflon) Safe?*, CHEMSEC, Feb. 10, 2022, https://chemsec.org/the-teflon-chemical-ptfe-is-often-touted-as-a-safe-cousin-of-toxic-pfas-but-is-it-really/ (last visited Nov. 3, 2023) (study found that PFOA was found in water and air near PTFE producing plants).

[8] *Id.*

[9] *Perfluorooctanoic Acid (PFOA), Perfluorooctane Sulfonate (PFOS), and Related Chemicals*, AM. CANCER SOCIETY (Mar. 21, 2023), https://www.cancer.org/cancer/risk-prevention/chemicals/teflon-and-perfluorooctanoic-acid-pfoa.html.

[10] *Id.*

California residents is restricted from making "chemical-free" claims in promoting their cookware because those claims are incredibly hard to prove, unlikely to be true, and, therefore, are inherently misleading to consumers.  This is likely a first step to additional legislation across the country that will address the misleading nature of calling cookware, and consumer products in general, free from PFAS.  Moreover, in addition to being deceptive and misleading, MIC's free from claims violate California law.[11]

8.      There are a number of health concerns related to exposure to PFAS.  Indeed, the health concerns surrounding PFOA, a well-known member of the PFAS family because it used to be a popular ingredient in non-stick and stain resisting coatings, were a hot button issue not too long ago.  PFOA was phased out of production in 2002 due to health-related concerns.[12]

9.      PFOA concerns included that it stays in the human body, as well as in the environment, for significant periods of time.  Health studies on PFOA indicate that people who have been exposed to the chemical are more at risk for endocrine disruption, cancer, thyroid disease, bladder, kidney, and testicular cancer, liver damage and disease, and colitis.  When PFOA is used in making non-stick cookware, it can be a significant health risk over time, particularly because the non-stick coating scratches, peels, and burns off during the cooking process, becoming a toxic pollutant that may make its way into food or into the air we breathe.

10.     PFAS, like PFOA are used in the process of making PTFE.[13], [14]  Notably, emissions of PFOA and other PFAS near PTFE producing manufacturing plants have been documented in

---

[11] *California Requires New Cookware Chemical Labeling Requirements by January 1st*, JDSUPRA, Nov. 30, 2022, https://www.jdsupra.com/legalnews/california-requires-new-cookware-2459164/ (last visited June 1, 2023)

[12] US Environmental Protection Agency (EPA). 2017. "Fact Sheet: 2010/2015 PFOA Stewardship Program." Retrieved from https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-20102015-pfoa-stewardshipprogram#mfg. Accessed April 2017.

[13] *Id.*

[14] *Is PTFE (Teflon) Safe?*, *supra* note 7.

both China and the United States for years, leading to widespread environmental contamination of air, soil, water, and food.  Additionally, when you heat PTFE up, to cook for example, the long molecular chain (its' distinguishing factor from chemicals like PFOA that are known to cause detrimental health problems) collapses in a short chain, like the molecular makeup of other PFAS. It is therefore misleading for MIC to represent to consumers that its cookware is "100% non-toxic" and free from PFOA because the manufacturing process of cookware containing PTFE is ridden with PFAS and PFOA, and heating PTFE while cooking changes the molecular makeup of PTFE to one that more closely resembles other PFAS and PFOA.

11.     On October 26, 2022, Consumer Reports ("CR") published a report from a test it conduct on "non-toxic" cookware.  It tested three nonstick pans that all claimed to be free from PFAS, including the coatings on the Swiss Diamond, Always, and Red Copper nonstick frying pans to see if they were really free from PFAS chemicals.[15]  The Swiss Diamond pan had a PTFE coating and was said to be PFOA-free and used PTFE in its non-stick coating, identical or substantively similar to MIC's cookware.

12.     The CR test revealed that the PTFE coated Swiss Diamond pan had measurable amounts of PFOA and several other PFAS.  Specifically, the Swiss Diamond pan had measurable levels of 16 of the 96 PFAS included in the test and contained PFOA in the PFTE coating, even though the package said it was PFOA-free.

13.     CR further concluded that PFOA-free should not be displayed on non-stick cookware using a PTFE coating, because that claim is unreliable and also, consumers looking to avoid PFAS in cookware should look for products that claim to be "PTFE free".[16]

---

[15] Kevin Loria, *You Can't Always Trust Claims on 'Non-Toxic' Cookware*, CONSUMER REPORTS, Oct. 26, 2022, https://www.consumerreports.org/toxic-chemicals-substances/you-cant-always-trust-claims-on-non-toxic-cookware-a4849321487/ (last visited May 25, 2023).
[16] *Id.*

14.     MIC claims its cookware is "non-toxic" and "made without PFOAs," but the cookware has a PTFE non-stick coating just like the Swiss Diamond pan.

15.     Beginning in August of 2023, MIC added a "California Safer Food Packaging and Cookware Act (AB 1200) Disclosure" page to its website, which admits the intentional addition of PFAS chemicals, such as PTFE, to its Non-Stick products.[17]

16.     Prior to the August 2023 addition to its website, MIC uniformly failed to disclose the use and inclusion of PTFE in its Non-Stick products across its website, through which a substantial portion of its customers purchase MIC Non-Stick products.

17.     MIC was, at all times, aware of the deceptive nature of its "non-toxic" and "free-from" claims. In or around August of 2023, MIC further removed references to its products being "non-toxic" and "made without PFOAs" across all webpages concerning its Non-Stick products within the MIC website.

18.     Thus, prior to August of 2023, any consumer wishing to purchase an MIC Non-Stick pan could navigate to MIC's website, research the Non-Stick pans, select a Non-Stick product, and complete a purchase of what they believed to be a "non-toxic" pan "made without PFOAs" without ever being notified that the products, in fact, contained PFAS "forever chemicals" like PTFE.

19.     Plaintiffs individually and on behalf of a class of similarly situated individuals, bring this class action to end Defendant's deceptive practices and to recover damages from Defendant's misconduct.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28

---

[17] *See California Safer Food Packaging and Cookware Act (AB 1200) Disclosure*, MADE IN COOKWARE, https://madeincookware.com/pages/AB-1200 (last visited October 24, 2023).

U.S.C. §1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000.00, and there is diversity of citizenship between plaintiffs, who, as alleged below, are citizens of different states than Defendant.

21.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(1) and (2). Defendant is headquartered in and has its principal place of business in the Austin Division of the Western District of Texas and substantial acts in furtherance of the alleged improper conduct occurred within this District.

## PARTIES

**Plaintiff Scott Elseroad**

22.     Plaintiff Elseroad is a citizen of Maryland.

23.     Plaintiff Elseroad purchased MIC non-stick products, including a Multi-Material Frying Pan Set, in or around November of 2022 through Defendant's website.

24.     As described herein, Defendant represented to Plaintiff that the Non-Stick Frying Pan included in the Multi-Material Frying Pan Set was a non-toxic, non-stick pan made without PFOAs.  Specifically, on the website from which Plaintiff Elseroad purchased the MIC non-stick products, they were described as "100% non-toxic" and "made without PFOAs."[18]

25.     Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the products were non-toxic and free from harmful substances, such as PFOAs.

26.     Had Plaintiff known the MIC product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOAs, Plaintiff would not have purchased the product or would have paid significantly less for it.

---

[18] *See Non Stick*, MADE IN, https://madeincookware.com/collections/non-stick (last visited July 3, 2023).

**Plaintiff Evan Dorosheff**

27.     Plaintiff Dorosheff is a citizen of Illinois.

28.     Plaintiff Dorosheff purchased MIC non-stick products, including 8-inch and 12-inch Non-Stick Frying Pans, in or around April of 2021 through Defendant's website.

29.     As described herein, Defendant represented to Plaintiff that these products were non-toxic, non-stick pans made without PFOAs.  Specifically, on the website from which Plaintiff Elseroad purchased the MIC non-stick products, they were described as "100% non-toxic" and "made without PFOAs."[19]

30.     Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the products were non-toxic and free from harmful substances, such as PFOAs.

31.     Had Plaintiff known the MIC product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOAs, Plaintiff would not have purchased the product or would have paid significantly less for it.

**Plaintiff David Estey**

32.     Plaintiff Estey is a citizen of Illinois.

33.     Plaintiff Estey purchased MIC non-stick products, including an 8-inch Non-Stick Frying Pan, in or around June of 2021 through Defendant's website.

34.     As described herein, Defendant represented to Plaintiff that this product was a non-toxic, non-stick pan made without PFOAs.  Specifically, on the website from which Plaintiff Estey purchased the MIC non-stick products, they were described as "100% non-toxic" and "made

---

[19] *See id.*

without PFOAs."[20]

35.     Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the products were non-toxic and free from harmful substances, such as PFOAs.

36.     Had Plaintiff known the MIC product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOAs, Plaintiff would not have purchased the product or would have paid significantly less for it.

**Plaintiff Jonathan Schmidt**

37.     Plaintiff Schmidt is a citizen of North Carolina.

38.     Plaintiff Schmidt purchased MIC non-stick products, including Non-Stick Saute Pans, in or around June of 2023 through a sales representative of Defendant.

39.     As described herein, Defendant represented to Plaintiff that these products were non-toxic, non-stick pans made without PFOAs. Specifically, the sales representative from whom Plaintiff Schmidt purchased the MIC non-stick products sent Plaintiff a MIC product catalog. The catalog described the Non-Stick products as "completely toxin-free" and "made without PFOAs."

40.     Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the products were non-toxic and free from harmful substances, such as PFOAs.

41.     Had Plaintiff known the MIC product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOAs, Plaintiff would not have purchased the product or would have paid significantly less for it.

---

[20] *See id.*

**Plaintiff Darrick Thompson**

42.     Plaintiff Thompson is a citizen of Washington.

43.     Plaintiff Thompson purchased MIC non-stick products, including a 10-inch Non-Stick Frying Pan, in or around November of 2022 through Defendant's website.

44.     As described herein, Defendant represented to Plaintiff that this product was a non-toxic, non-stick pan made without PFOAs.  Specifically, on the website from which Plaintiff Thompson purchased the MIC non-stick products, they were described as "100% non-toxic" and "made without PFOAs."[21]

45.     Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the products were non-toxic and free from harmful substances, such as PFOAs.

46.     Had Plaintiff known the MIC product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOAs, Plaintiff would not have purchased the product or would have paid significantly less for it.

**Plaintiff Ryan Dishman**

47.     Plaintiff Dishman is a citizen of Colorado.

48.     Plaintiff Dishman purchased MIC non-stick products, including 8-inch, 10-inch, and 12-inch Non-Stick Frying Pans, in or around February of 2022 and March of 2023 through Defendant's website.

49.     As described herein, Defendant represented to Plaintiff that these products were non-toxic, non-stick pans made without PFOAs. Specifically, on the website from which Plaintiff Dishman purchased the MIC non-stick products, they were described as "100% non-toxic" and

---

[21] *See id.*

"made without PFOAs."[22]

50.     Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the products were non-toxic and free from harmful substances, such as PFOAs.

51.     Had Plaintiff known the MIC product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOAs, Plaintiff would not have purchased the product or would have paid significantly less for it.

**Plaintiff Brent Mills**

52.     Plaintiff Mills is a citizen of Kentucky.

53.     Plaintiff Mills purchased MIC non-stick products, including Non-Stick Frying Pans, in or around January of 2023 through a Habitat for Humanity ReStore in Louisville, Kentucky.

54.     As described herein, Defendant represented to Plaintiff that these products were non-toxic, non-stick pans made without PFOAs. Specifically, Plaintiff received and reviewed email advertisements which represented that the MIC Non-Stick Frying Pans contain a "100% non-toxic coating made without PFOAs."

55.     Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the products were non-toxic and free from harmful substances, such as PFOAs.

56.     Had Plaintiff known the MIC product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOAs, Plaintiff would not have purchased the product or would have paid significantly less for it.

---

[22] *See id.*

**Plaintiff Monalisa Bojorquez**

57.     Plaintiff Bojorquez is a citizen of California.

58.     Plaintiff Bojorquez purchased MIC non-stick products, including a Non-Stick Frying Pan, in 2021 through Defendant's website.

59.     As described herein, Defendant represented to Plaintiff that this product was a non-toxic, non-stick pan made without PFOAs. Specifically, on the website from which Plaintiff Bojorquez purchased the MIC non-stick products, they were described as "100% non-toxic" and "made without PFOAs."[23]

60.     Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the products were non-toxic and free from harmful substances, such as PFOAs.

61.     Had Plaintiff known the MIC product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOAs, Plaintiff would not have purchased the product or would have paid significantly less for it.

**Plaintiff Gil Refael**

62.     Plaintiff Refael is a citizen of New York.

63.     Plaintiff Refael purchased MIC non-stick products, including a Non-Stick Frying Pan, in or around January of 2023 through Defendant's website.

64.     As described herein, Defendant represented to Plaintiff that this product was a non-toxic, non-stick pan made without PFOAs. Specifically, on the website from which Plaintiff Refael purchased the MIC non-stick products, they were described as "100% non-toxic" and "made without PFOAs."[24]

_____

[23] *See id.*
[24] *See id.*

65. Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the products were non-toxic and free from harmful substances, such as PFOAs.

66. Had Plaintiff known the MIC product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOAs, Plaintiff would not have purchased the product or would have paid significantly less for it.

**Plaintiff Ben Luckadoo**

67. Plaintiff Luckadoo is a citizen of New York.

68. Plaintiff Luckadoo purchased MIC non-stick products, including an 8-inch Non-Stick Frying Pan and a Non-Stick Sheet Pan, in or around April of 2023 through Defendant's website.

69. As described herein, Defendant represented to Plaintiff that these products were non-toxic, non-stick pans and cookware made without PFOAs. Specifically, on the website from which Plaintiff Luckadoo purchased the MIC non-stick products, they were described as "100% non-toxic" and "made without PFOAs."[25]

70. Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the products were non-toxic and free from harmful substances, such as PFOAs.

71. Had Plaintiff known the MIC product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOAs, Plaintiff would not have purchased the product or would have paid significantly less for it.

_____

[25] *See id.*

**Defendant**

72.     Defendant Boston Foundry, Inc. d/b/a Made In Cookware is a Delaware for-profit corporation headquartered in Austin, Texas and has its principal place of business at 1000 E. Cesar Chavez Street, Suite 1000, Austin, Texas 78702. The Defendant is a citizen of Texas.   The registered agent for service of process is Corporation Service Company dba CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

73.     Boston Foundry, Inc., under the brand name Made In Cookware, manufactures and sells stainless clad, non-stick, carbon steel, enameled cast iron, and copper cookware. MIC sells its products both online, including directly from its website, https://madeincookware.com/, and through online retailers like Amazon or Walmart. Defendant offers a variety of products, including individual pans, pots, and woks, cookware sets, tabletop sets, knives, and bakeware. MIC markets its pans, pots, woks, and cookware as "non-toxic" and being made without certain chemicals, including PFOAs.

## FACTUAL ALLEGATIONS

### A.     The Green Movement and Greenwashing

74.     In recent years, consumers have become significantly more aware and sensitive to their impact on the environment through the products they purchase and use.   As a result, a movement has developed demanding consumer products that contain natural ingredients and are environmentally sound, i.e. that do not harm the environment through the product's ingredients, manufacture, use, or disposal.   The term "Green" is commonly used to describe these products, and the environmental movement that led to them.

75.     In response to consumers' desire for safe, clean, and natural products, many companies "greenwash" their products by deceptively claiming that their products are safer or

cleaner than they are.  Rather than creating the safe, clean, non-toxic products that consumers desire, many companies have chosen to "greenwash" their products through deceptive labeling, suggesting and outright stating that their products are safe, clean, or natural when, in fact, they contain ingredients that are harmful to humans, animals, and/or the environment, or are otherwise not clean products.

76.     Greenwashing is the "activities by a company or an organization that are intended to make people think that it is concerned about the environment, even if its real business practice actually harms the environment."  Oxford English Dictionary.

77.     Environmentalist Jay Westerveld coined the term "greenwashing" in 1986, in a critical essay inspired by the irony of the "save the towel" movement in hotels that had little impact beyond saving hotels money in laundry costs.  The idea emerged in a period when most consumers received their news primarily from television, radio, and print media, so they could not fact-check the way they can today via the internet.

78.     Companies that have engaged in greenwashing on a wide scale have made headlines over the years.  In the mid-'80s, for example, oil company Chevron commissioned a series of expensive television and print ads to broadcast its environmental dedication.  But while the now-infamous "People Do" campaign ran, Chevron was actively violating the Clean Air Act and Clean Water Act, as well as spilling oil into wildlife refuges.

79.     Chevron was far from the only corporation making outrageous claims, unfortunately.  In 1991, chemical company DuPont announced its double-hulled oil tankers with ads featuring marine animals prancing in chorus to Beethoven's "Ode to Joy." It turned out the company was the largest corporate polluter in the U.S. that year.

80.     Unfortunately for consumers, false claims of environmental soundness have grown

along with the demand for green products.  In a released study, the environmental consulting group TerraChoice Environmental Marketing found that 98% of more than 2,000 products it surveyed in North America made false and misleading environmental claims by committing one or more of what it classified as the "Seven Sins of Greenwashing"[26]:

a.  <u>The Sin of the Hidden Trade-off</u> – committed by suggesting a product is "green" based on an unreasonably narrow set of attributes without attention to other important environmental issues;

b.  <u>The Sin of No Proof</u> – committed by an environmental claim that cannot be substantiated by easily accessible supporting information or by a reliable third-party certification;

c.  <u>The Sin of Vagueness</u> – committed by every claim that is so poorly defined or broad that its real meaning is likely to be misunderstood by the consumer;

d.  <u>The Sin of Irrelevance</u> – committed by making an environmental claim that may be truthful but is unimportant or unhelpful for consumers seeking environmentally preferable products;

e.  <u>The Sin of Lesser of Two Evils</u> – committed by claims that may be true within the product category but that risk distracting the consumer from the greater environmental impacts of the category as a whole;

f.  <u>The Sin of Fibbing</u> – committed by making environmental claims that are simply false; and

g.  <u>The Sin of Worshipping False Labels</u> – committed by a product that, through either words or images, gives the impression of third-party

---

[26] http://sinsofgreenwashing.org/.

endorsement where no such endorsement actually exists or fake labels.

81.     To put it plainly, corporate greed is in these days and corporations, like Defendant, will do whatever it takes, even in some cases participate in greenwashing or other forms of related deception to consumers, to appear environmentally conscious, safe, and clean.  Recognizing this problem, the United States Federal Trade Commission ("FTC") created the "Green Guides" to help companies avoid making misleading and deceptive claims.[27]

## B.     FTC Regulation of Greenwashing and the Green Guides

82.     Section 5 of the FTC Act prohibits deceptive acts and practices in or affecting commerce.  A representation, omission, or practice is deceptive if it is likely to mislead consumers acting reasonably under the circumstances and is material to consumers' decisions.[28]

83.     In the context of environmental marketing claims, a reasonable basis often requires competent and reliable scientific evidence.  Such evidence consists of tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results.  Such evidence should be sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered considering the entire body of relevant and reliable scientific evidence, to substantiate that each of the marketing claims is true.[29]

84.     According to the FTC, the following general principles apply to environmental marketing claims.[30]

---

[27] *See generally* 16 C.F.R. § 260—Guide for the User of Environmental Marketing Claims.
[28] *See* FTC Policy Statement on Deception, 103 F.T.C. 110, 174 (1983), *available at* https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf
[29] Part 260—Guides for the Use of Environmental Marketing Claims, FTC, https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguides.pdf, (Mar. 21, 2023).
[30] 16 C.F.R. § 260.3.

a. <u>Qualifications and Disclosures</u>: To prevent deceptive claims, qualifications and disclosures should be clear, prominent, and understandable.  To make disclosures clear and prominent, marketers should use plain language and sufficiently large type, should place disclosures in close proximity to the qualified claim, and should avoid making inconsistent statements or using distracting elements that could undercut or contradict the disclosure.

b. <u>Distinction Between Benefits of Product, Package, and Service:</u> Unless it is clear from the context, an environmental marketing claim should specify whether it refers to the product, the product's packaging, a service, or just to a portion of the product, package, or service.  In general, if the environmental attribute applies to all but minor, incidental components of a product or package, the marketer need not qualify the claim to identify that fact.  However, there may be exceptions to this general principle.  For example, if a marketer makes an unqualified recyclable claim, and the presence of the incidental component significantly limits the ability to recycle the product, the claim would be deceptive.

 i. Example: A plastic package containing a new shower curtain is labeled "recyclable" without further elaboration. Because the context of the claim does not make clear whether it refers to the plastic package or the shower curtain, the claim is deceptive if any part of either the package or the curtain, other than minor, incidental components, cannot be recycled.

c. <u>Overstatement of Environmental Attribute</u>: An environmental marketing claim should not overstate, directly or by implication, an environmental attribute or benefit.  Marketers should not state or imply environmental benefits if the benefits are negligible.

 i. Example: A trash bag is labeled "recyclable" without qualification. Because trash bags ordinarily are not separated from other trash at the

landfill or incinerator for recycling, they are highly unlikely to be used again for any purpose.  Even if the bag is technically capable of being recycled, the claim is deceptive since it asserts an environmental benefit where no meaningful benefit exists.

d.    <u>Comparative Claims</u>: Comparative environmental marketing claims should be clear to avoid consumer confusion about the comparison.  Marketers should have substantiation for the comparison.

    i.   Example: An advertiser notes that its glass bathroom tiles contain "20% more recycled content." Depending on the context, the claim could be a comparison either to the advertiser's immediately preceding product or to its competitors' products.  The advertiser should have substantiation for both interpretations.  Otherwise, the advertiser should make the basis for comparison clear, for example, by saying "20% more recycled content than our previous bathroom tiles."

e.    <u>Certifications and Seals of Approval</u>: It is deceptive to misrepresent, directly or by implication, that a product, package, or service has been endorsed or certified by an independent third party.  A marketer's use of an environmental certification or seal of approval likely conveys that the product offers a general environmental benefit (see § 260.4) if the certification or seal does not convey the basis for the certification or seal, either through the name or some other means.

    i.   Example: An advertisement for paint features a "GreenLogo" seal and the statement "GreenLogo for Environmental Excellence." This advertisement likely conveys that: (1) the GreenLogo seal is awarded by an independent, third-party certifier with appropriate expertise in evaluating the environmental attributes of paint; and (2) the product has far-reaching environmental benefits. If the paint manufacturer awarded the seal to its own product, and no independent, third-party certifier objectively evaluated the paint using independent standards, the claim would be deceptive.

f.    <u>Biodegradable Claims:</u> It is deceptive to misrepresent, directly or by implication, that a product or package is degradable, biodegradable, oxo-degradable, oxo-biodegradable, or photodegradable.  A marketer making an

unqualified degradable claim should have competent and reliable scientific evidence that the entire item will completely break down and return to nature within a reasonably short period of time after customary disposal.

  i.   Example: A marketer advertises its trash bags using an unqualified "degradable" claim.  The marketer relies on soil burial tests to show that the product will decompose in the presence of water and oxygen.  Consumers, however, place trash bags into the solid waste stream, which customarily terminates in incineration facilities or landfills where they will not degrade within one year.  The claim is, therefore, deceptive.

g.   <u>Free-Of Claims</u>: It is deceptive to misrepresent, directly or by implication, that a product, package, or service is free of, or does not contain or use, a substance.  A truthful claim that a product, package, or service is free of, or does not contain or use, a substance may nevertheless be deceptive if: (1) the product, package, or service contains or uses substances that pose the same or similar environmental risks as the substance that is not present; or (2) the substance has not been associated with the product category. [31]

  i.   Example: A package of t-shirts is labeled "Shirts made with a chlorine-free bleaching process." The shirts, however, are bleached with a process that releases a reduced, but still significant, amount of the same harmful byproducts associated with chlorine bleaching.  The claim overstates the product's benefits because reasonable consumers likely would interpret it to mean that the product's manufacture does not cause any of the environmental risks posed by chlorine bleaching.

h.   <u>Non-Toxic Claims:</u> It is deceptive to misrepresent, directly or by implication, that a product, package, or service is non-toxic.  A non-toxic claim likely conveys that a product, package, or service is non-toxic both for humans and for the environment generally.   Therefore, marketers making non-toxic claims should have competent and reliable scientific evidence that the product, package, or service is non-toxic for humans and

---

[31] *Id.* § 260.9.

for the environment or should clearly and prominently qualify their claims

to avoid deception.

    i.   Example: A marketer advertises a cleaning product as "essentially non-toxic" and "practically non-toxic." The advertisement likely conveys that the product does not pose any risk to humans or the environment, including household pets. If the cleaning product poses no risk to humans but is toxic to the environment, the claims would be deceptive.

i.   <u>Ozone-Safe Claims:</u> It is deceptive to misrepresent, directly or by

implication, that a product, package, or service is safe for, or friendly to, the

ozone layer or the atmosphere.

    i.   An aerosol air freshener is labeled "ozone-friendly." Some of the product's ingredients are volatile organic compounds (VOCs) that may cause smog by contributing to ground-level ozone formation. The claim likely conveys that the product is safe for the atmosphere as a whole, and, therefore, is deceptive.

j.   <u>Recyclable Claims:</u> It is deceptive to misrepresent, directly or by

implication, that a product or package is recyclable. A product or package

should not be marketed as recyclable unless it can be collected, separated,

or otherwise recovered from the waste stream through an established

recycling program for reuse or use in manufacturing or assembling another

item.

    i.   Example: A nationally marketed plastic yogurt container displays the Resin Identification Code (RIC) (which consists of a design of arrows in a triangular shape 6 containing a number in the center and an abbreviation identifying the component plastic resin) on the front label of the container, in close proximity to the product name and logo. This conspicuous use of the RIC constitutes a recyclable claim. Unless recycling facilities for this container are available to a substantial majority of consumers or communities, the manufacturer should qualify the claim to disclose the limited availability of recycling programs.

85.   The Green Guides also provide additional examples of marketing claims to

"provide the Commission's views on how reasonable consumers likely interpret certain claims."[32]

The FTC provided the following relevant examples:[33]

- The brand name "Eco-friendly" likely conveys that the product has far reaching environmental benefits and may convey that the product has no negative environmental impact.  Because it is highly unlikely that the marketer can substantiate these claims, the use of such a brand name is deceptive.

- A brand name like "Eco-safe" would be deceptive if, in the context of the product so named, it leads consumers to believe that the product has environmental benefits which cannot be substantiated by the manufacturer.  The claim would not be deceptive if "Eco-Safe" were followed by clear and prominent qualifying language limiting the safety representation to a particular product attribute for which it could be substantiated, and provided that no other deceptive implications were created by the context.

- A product label contains an environmental seal, either in the form of a globe icon, or a globe icon with only the text "Earth Smart" around it. Either label is likely to convey to consumers that the product is environmentally superior to other products. If the manufacturer cannot substantiate this broad claim, the claim would be deceptive. The claims would not be deceptive if they were accompanied by clear and prominent qualifying language limiting the environmental superiority representation to the particular product attribute or attributes for which they could be substantiated, provided that no other deceptive implications were created by the context.

- A marketer states that its packaging is now "Greener than our previous packaging." The packaging weighs 15% less than previous packaging, but it is not recyclable, nor has it been improved in any other material respect. The claim is deceptive because reasonable consumers likely would interpret "Greener" in this context to mean that other significant environmental aspects of the packaging also are improved over previous packaging.

- A marketer advertises a cleaning product as 'essentially non-toxic' and 'practically non-toxic.' The advertisement likely conveys that the product does not pose any risk to humans or the environment, including household pets.  If the cleaning product poses no risks to humans but is toxic to the environment, the claims would be deceptive.

## C.    Consumers and Green Products

86.    Consumers are regularly choosing more environmentally friendly products.  In fact, some consumers are changing their buying behavior to reduce the impact of their consumption habits over the environment, choosing an environment-friendly consumption behavior, often

---

[32] *Id.* § 260.1(d).
[33] *Id.* § 260.1.

called green consumption.[34]

87.     Consumers and investors increasingly care about a business' positive impact and will make decisions according to brand perceptions.  In a 2019 CSR Survey conducted by Aflac, 77% of consumers felt motivated to make purchasing decisions from companies committed to making the world a better place and 73% of investors viewed these efforts as contributors to return on investment, and, in turn, often look favorably on companies with conscious social and environmental impact.

88.     In 2021, GreenPrint's Business of Sustainability Index, found that 64% of Gen X consumers would spend more on a product if it comes from a sustainable brand, and that figure jumps to 75% among millennials.

89.     Today, consumers across all generations—from Baby Boomers to Gen Z—are willing to spend more for sustainable products, and the percentages of consumers in those generations willing to pay more for sustainable products is growing.  Now, at least 90% of Gen X consumers said that they would be willing to spend an extra 10% or more for sustainable products.[35]

90.     An    international    study    of    20,000    customers    by    grocery    brand giant Unilever identified one in three (33%) people were choosing to buy from brands they believe are doing environmental good.[36]

---

[34] "Greenwashing effect, attitudes, and beliefs in green consumption," EMERALD INSIGHT, Mar. 12, 2019, https://www.emerald.com/insight/content/doi/10.1108/RAUSP-08-2018-0070/full/html, (Mar. 21, 2023).

[35] Greg Petro, "Consumers Demand Sustainable Products and Shopping Formats," FORBES, Mar. 11, 2022, https://www.forbes.com/sites/gregpetro/2022/03/11/consumers-demand-sustainable-products-and-shopping-formats/?sh=551188856a06, (Mar. 21, 2023).

[36] "Climate explained: are consumers willing to pay more for climate-friendly products?" THE CONVERSATION, Sept. 29, 2020, https://theconversation.com/climate-explained-are-consumers-willing-to-pay-more-for-climate-friendly-products-146757, (Mar. 21, 2023).

91.     A desire to help the environment is the primary reason consumers purchase sustainable products and brands.  Almost 30% say they want to improve the environment, with 23% wishing to reduce production waste, 22% wishing to reduce their carbon footprint, and 17% concerned with animal welfare.[37]  Consumers care about the environment and are purchasing environmentally sound products to support those interests.

92.     Consumers are also concerned about safety and an inclination towards safer products is guiding consumer choices.  A recent survey found that "[w]hen asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free from certain toxic chemicals (70%)."[38]

93.     Green labels and product marketing impact consumer buying decisions.  Marketing and labels allow consumers to make comparisons among products and services in the category and decide their preference.[39]  Indeed, labels make is easier for consumers to identify green products when they are shopping, reducing consumers' purchase time.  Consumers consider the information related to the environmental attributes of products that companies, like Defendant, put on their label and use that information to make a purchase decision.[40]  Thus, labels and green marketing tactics, like those used by Defendant, impact consumer buying behavior.

---

[37] *Id.*

[38] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wp-content/uploads/2017/07/What-Shoppers-Want.pdf  (Mar. 21, 2023).

[39] "Marketing & Sustainability," MAJOR SUSTAINABILITY, PENN STATE, https://majorsustainability.smeal.psu.edu/green-labelling/, (Mar. 21, 2023).

[40] "The Effect of Green Marketing Strategy on Purchasing Decisions: A Review of Previous Research," INTERNATIONAL JOURNAL OF SCIENTIFIC & TECHNOLOGY RESEARCH VOLUME 8, ISSUE 12, Dec. 2019, https://www.ijstr.org/final-print/dec2019/The-Effect-Of-Green-Marketing-Strategy-On-Purchasing-Decisions-A-Review-Of-Previous-Research.pdf, (Mar. 21, 2023).

94.     For these reasons, companies like Defendant have expanded their marketing efforts to attract consumers into purchasing cookware marked "non-toxic" and "free from" various chemicals.

**D.     Poly-fluoroalkyl Substances ("PFAS") and Cookware**

95.     PFAS are a series of chemicals that studies have linked to harmful side effects.

96.     PFAS chemicals are a class of more than 4,700 man-made chemical compounds that have a characteristic per fluorinated carbon monitory that confers hydrophobic chemical properties and environmental persistence.   PFAS are known as "forever chemicals" because they do not easily break down in the human body or the environment, and thus, persist over long periods of time.   Their characteristic benefits—including persistence and hydrophobic properties—propelled their use in thousands of products, including personal care products, fabrics, carpets, cookware, food packaging, and other commercial uses.[41]

97.     PFAS chemicals are dangerous to humans.   Exposure to PFAS chemicals is associated with an elevated risk for certain cancers, liver and kidney failures, immunological problems, and reproductive and developmental harm.   Indeed, "[M]eta-analyses point to a high toxicity and potentially bioaccumulative properties of some metabolites of" PFAS chemicals.[42] All PFAS contain carbon-fluorine bonds—one of the strongest in nature—making PFAS very persistent in the environment and in human bodies.[43]

98.     A recent New York Times article discussed the effect of PFAS exposure to pregnant

---

[41] Heather D. Whitehead, et al., "Fluorinated Compounds in North American Cosmetics," ENVIRON.   SCI.   &   TECHNOL.   LETT.   Jun.   15,   2021, https://pubs.acs.org/doi/suppl/10.1021/acs.estlett.1c00240/suppl_file/ez1c00240_si_001.pdf, (Mar. 21, 2023).

[42] *Id.*

[43] Jessian Choy, "My Menstrual Underwear has Toxic Chemicals in It," SIERRA, Jan. 7, 2020,   https://www.sierraclub.org/sierra/ask-ms-green/my-menstrual-underwear-has-toxic-chemicals-it, (Mar. 21, 2023).

women and babies, explaining the effects of PFAS on metabolism and immunity:[44]

> [s]cientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.
>
> 'And while we understandably focus on highly contaminated communities,' Dr. Lanphear said, 'we can predict based upon all the other evidence, that there's unlikely to be any safe level.'

99.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[45]

100.     "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[46]

101.     The current Environmental Protection Agency's health advisory for PFAS limit PFAS for safe consumption to just 70 nanograms per liter.[47]  PFAS can be harmful at a very, very

---

[44] "These Everyday Toxins May be Hurting Pregnant Women and Their Babies," THE NEW YORK TIMES, https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html, (Mar. 21, 2023).

[45] "What are the health effects of PFAS?" AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, https://www.atsdr.cdc.gov/pfas/health-effects/index.html, (Mar. 21, 2023).

[46] "The Madrid Statement," GREEN SCIENCE POLICY INSTITUTE, https://greensciencepolicy.org/our-work/science-policy/madrid-statement/, (Mar. 21, 2023).

[47] "High Levels of PFAS Found in Anti-Fogging Sprays and Cloths," DUKE UNIVERSITY, NICHOLAS SCHOOL OF THE ENVIRONMENT, Jan. 5, 2022, https://nicholas.duke.edu/news/high-levels-pfas-foundanti-fogging-sprays-and-cloths, (Mar. 21, 2023).

low concentration.

102.    This is especially true when PFAS are used in a manner that makes them absorbable or inhalable by humans, such as through cookware.

103.    That PFAS are harmful to the human body is beyond dispute.  In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[48]

104.    The Centers for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[49]

105.    In total, this research demonstrates that the risk of severe health complications arising from exposure to PFAS is both credible and substantial.

106.    Additionally, PFAS pose a risk to the environment, where once introduced, can quickly spread around the globe through multiple pathways.[50]

## E.    MIC's Business And "Green" Representations

107.    Defendant makes several representations to consumers claiming its pans or products are PFOA free.  For purposes of the Complaint, "MIC Products" means any of MIC's non-stick cookware, including the 12" Non Stick Frying Pan, 10" Non Stick Frying Pan, 8" Non Stick Frying Pan, 6" Non Stick Frying Pan, 4 QT Non Stick Saucepan, 2 QT Non Stick Saucepan, 1 QT Non Stick Saucepan, 3 QT Non Stick Saucier, 3.5 QT Non Stick Saute Pan, 8 QT Non Stick Stock Pot, ½ Sheet Pan, ¼ Sheet Pan, 3-Piece "The Non Stick Set," 7-Piece "The Non Stick Set,"

---

[48]    "PFAS Explained," ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/pfas/pfas-explained, (Mar. 21, 2023).

[49]    *See supra* note 38, https://www.atsdr.cdc.gov/pfas/health-effects/index.html.

[50]    "What are PFAS?" PFAS FREE, https://www.pfasfree.org.uk/about-pfas (Mar. 21, 2023).

10-Piece "The Non Stick Set," 3-Piece "Non Stick Frying Pan" Set, 6-Piece "Non Stick Saucepan Set," 12" "Multi-Material Frying Pan Set," and 10" "Multi-Material Frying Pan Set." This includes all variations of these pans, saucepans, sauciers, pots, and sets, with or without a lid.

108.    Defendant advertises and sells MIC Products in its store locations in Austin, Texas and online via its own website and through third party websites like Amazon and Walmart. Below are some examples of the MIC Products for sale:

109.    MIC's Website:[51]





[51] *The Non Stick Set*, MADE IN COOKWARE, https://madeincookware.com/products/non-stick-set/10-piece-set-graphite (last visited Aug. 21, 2023); *Non Stick Frying Pan*, MADE IN COOKWARE, https://madeincookware.com/products/non-stick-frying-pan/10-inch-graphite (last visited Aug. 21, 2023); *Sheet Pan*, MADE IN COOKWARE, https://madeincookware.com/products/sheet-pan/non-stick-half-sheet (last visited Aug. 21, 2023); *Non Stick*, MADE IN COOKWARE, https://madeincookware.com/collections/non-stick (last visited July 3, 2023) (underline added).





110.     On the MIC website, as demonstrated above, MIC classifies its pans as "100% non-toxic" and "made without PFOAs."  MIC also makes the following representations on the MIC website:[52]

_____

[52]    *Non Stick Frying Pan: Details*, MADE IN COOKWARE, https://madeincookware.com/products/non-stick-frying-pan/12-inch-graphite (last visited July 3,





2023) (underline added); *Non Stick Frying Pan: Popular Questions*, MADE IN COOKWARE, https://madeincookware.com/products/non-stick-frying-pan/set-pomme-red (last visited July 3, 2023) (underline added); *The Non Stick Set: Details*, MADE IN COOKWARE, https://madeincookware.com/products/non-stick-set/10-piece-set-graphite (last visited July 3, 2023) (underlines added).



111.   MIC additionally represents that its non-stick cookware is environmentally sustainable, stating:

**Is Non Stick Sustainable?**

We've spent a long time thinking about whether non stick cookware is sustainable, and it's why we made sure ours is so high-quality that it lasts 70 times longer than a ceramic non stick pan. Where cheap non stick needs to be replaced within months, ours last for years, meaning there are fewer produced and even fewer in landfills. We also set up our mail-back recycling program to make them even greener.[53]

112.   MIC further touts the sustainability of its Non Stick Cookware, despite the environmental harms caused by PFAS "forever chemicals" such as PTFE present in the MIC Products, stating:

If you're in the habit of buying a new Non Stick Pan once every six months because it wears out, it's time for a change. Not only is this a waste of money, but it is extremely harmful to the environment.

---

[53] *The Most Common Non Stick Questions, Answered*, MADE IN (Aug. 28, 2023), https://madeincookware.com/blogs/non-stick-faqs.

The best course of action is to buy a high quality Non Stick Pan, one that won't need to be replaced every six months, but rather last you for years and stay performing at an exceptional rate.

And the Non Stick Cookware you're looking for is ours. We designed our cookware with as much care as our manufacturers put into making sure the process is as sustainable as possible.[54]

113.    MIC describes how non-stick cookware is made, stating, "Though the construction and materials will differ from manufacturer to manufacturer, non stick cookware is generally made by applying layers of a non stick material to a metal base (usually aluminum, stainless steel, or a combination).  Typically, the more layers of non stick coating that are applied, the longer the coating will last."[55]  Notably, MIC fails to disclose that the "non stick coating" referred to is PTFE.

114.    In August of 2023, MIC added a "California Safer Food Packaging and Cookware Act (AB 1200) Disclosure" page to its website, in which MIC admitted, for the first time within its website, the intentional addition of PFAS chemicals, such as PTFE, to its Non-Stick products.[56]

115.    Prior to the August 2023 addition to its website, MIC uniformly failed to disclose the use and inclusion of PTFE in its Non-Stick products across its website, through which a substantial portion of its customers purchase MIC Non-Stick products.

116.    Prior to this August 2023 addition, consumers who purchased MIC Products through the MIC website did so without any notification or disclosure that the "non stick coating" MIC touts was actually made from PTFE, a PFAS "forever chemical."

117.    Amazon sells MIC Products and below are screenshots from Amazon's website.

---

[54] George Steckel, *The Most Sustainable Non Stick Cookware*, MADE IN (Oct. 27, 2021), https://madeincookware.com/blogs/is-non-stick-cookware-sustainable.

[55] *The Ultimate Guide to Buying Non Stick Cookware*, MADE IN (Aug. 29, 2023), https://madeincookware.com/blogs/non-stick-cookware.

[56] *See California Safer Food Packaging and Cookware Act (AB 1200) Disclosure*, *supra* note 17.





118.    The Amazon screenshot above shows that Defendant is representing the MIC 12-inch Non-Stick Frying Pan as "100% Safe" and "made without harmful PFOAs."[57]

119.    Walmart sells MIC Products and below is a screen shot from Walmart's website:





120.     The Walmart screenshot above shows that Defendant is representing MIC Products as "100% Safe – Made In Non Stick Pans are crafted with high-performing PTFE and are made without harmful PFOAs."[58]  Defendant further describes its non-stick cookware as follows, "Our safe, healthy, made without PFOA Made Slick non stick surface is seriously slippery. We coat our non stick pans multiple times to make them extra durable and resistant to degradation."[59]

121.     Unlike the MIC website, MIC Product listings on Amazon and Walmart, as shown above, include the following: "100% Safe – Made In Non Stick Pans are crafted with high-performing PTFE and are made without harmful PFOAs." While MIC failed to disclose the inclusion of PTFE in its Non Stick Products on its website prior to August 2023, the Amazon and Walmart listings for MIC Products admit the inclusion of PTFE, but do so while also claiming PTFE is "100% Safe."

122.     Based on MIC's representations, consumers are left believing they are purchasing a "100% Safe" non-stick pan made without the harmful PFAS "forever chemical" PFOA, but receive a non-stick pan made from PTFE, a PFAS "forever chemical" of the same chemical family as PFOAs.

123.     In 2023, Defendant also made representations about its products being "non-toxic" and "PFOA-free," including the following social media post, as well:

---

[58]    https://www.walmart.com/ip/Made-In-Cookware-12-Non-Stick-Frying-Pan-Harbour-Blue/1320723544?wmlspartner=wlpa&selectedSellerId=101214257&adid=22222222227000000000&wl0=&wl1=g&wl2=c&wl3=42423897272&wl4=pla-295289030566&wl5=9060548&wl6=&wl7=&wl8=&wl9=pla&wl10=661164433&wl11=online&wl12=1320723544_101214257&veh=sem&gclid=CjwKCAjw6p-oBhAYEiwAgg2Pgoz9F6IEA6W0FdGgYaqmeQeXYM_rOMtOGC_FBgpFFqoqChciwuQjYBoCo3UQAvD_BwE (last visited July 3, 2023).
[59] *Id.*



124.    Heating PTFE to high temperatures, such as temperatures needed to cook steak, may change the composition of the chemical and may increase its hazard.[60]  For one of the MIC Products, the 8-quart Non Stick Stock Pot, MIC goes as far to say that its nonstick coating is "oven safe up to 800°F."[61] These representations that Defendant makes are misleading to consumers, including Plaintiffs, and consumers have been impacted and damaged by Defendant's non-toxic and "free from" claims about the MIC Cookware.

125.    Additionally, many consumers have reported through platforms such as the Better Business Bureau that the non-stick PTFE coating used in MIC Products peels off the MIC Products

---

[60]  *The Problem with Teflon and Other Non-Stick Pots and Pans*, LEAFSCORE, https://www.leafscore.com/eco-friendly-kitchen-products/the-problem-with-teflon-and-other-non-stick-pots-and-pans/#:~:text=PTFE%20starts%20to%20dissociate%20at,be%20released%20into%20the%20air. (last visited June 20, 2023).

[61]  *Non Stick Stock Pot*, MADE IN, https://madeincookware.com/products/non-stick-stock-pot/8-quart-harbour-blue (last visited Sept. 21, 2023).

and contaminates food cooked using the Products. Examples of such consumer complaints follow:



**Initial Complaint**
12/19/2022

**Complaint Type:** Guarantee/Warranty Issues
**Status:** Answered ❓

Purchased ****** set that included non-stick pans, order #******. Pans are stored nested with felt pan protectors in a cabinet. The 8" non-stick is used for eggs or blooming spices on medium heat about 4-5 times a month. Hand washed. Only use wooden or silicon tools. The non-stick on the 8" pan is literally pealing away slowly in one giant piece from the rim of the pan. It's clearly a manufacturing defect where the spray on nonstick coating did not sufficiently adhere to the stainless-steel substrate of the pan.I informed ****** support of the issue and provided a photo. They stated its out iof warranty and provided a 20% discount code toward a new pan. I would understand completely if I had damaged the nonstick or used pan outside of the prescribed parameters, but I didn't. Nothing I did contributed to the delamination of the nonstick.I would like the 3 non-stick pans that were ordered replaced due to manufacturing defects.I would also like to understand how these nonstick pans are tested and deemed to be in keeping with ******'s claims of quality, durability.



**Initial Complaint**
03/21/2022

**Complaint Type:** Guarantee/Warranty Issues
**Status:** Answered ❓

Hello,We purchased a set of Made In pots and pans in October of 2020. About a month after receiving them, we had several pans start showing rust. We were told by the company that this was normal. Fast forward and now the actual Teflon is peeling off the non-stick pans and coming off in food. We immediately stopped using all of the pans (Between the rust and the Teflon issues we felt it was not safe). I then had a series of e mails with them that stated they had a 45 day warranty. End of story. I also reached out to the owner on Linked In and got zero response. This entire matter of Made In putting out products that have a health issue and not standing behind them is just wrong ****

126.    Pans with scratched or peeling coatings are not as safe as pans in pristine condition, especially when the pans contain PFAS or PTFE in their coatings, like MIC Products.  Scratched or peeling non-stick coatings can cause flakes of the coating in food that humans later consume and can increase the production of harmful fumes.[62]

127.    Many of the claims Defendant makes about its cookware are—at best—misleading and—at worst—outright false.  For example, MIC claims that its cookware is "100% non-toxic"

---

[62]*See supra* notes 5, 8.

and "made without PFOAs."  Yet, the non-stick coating is made with PTFE, a known PFAS which on information and belief has measurable amounts of PFOA in the PTFE coating, as well.

## CLASS ALLEGATIONS

128.    Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of all others similarly situated, as representative of the following Nationwide Class and California, New York, Kentucky, Colorado, Maryland, Illinois, North Carolina, and Washington Subclasses:

**Nationwide Class:**

All citizens of the United States who purchased any of the MIC Products.

**California Subclass:**

All citizens of California who purchased any of the MIC Products.

**New York Subclass:**

All citizens of New York who purchased any of the MIC Products.

**Kentucky Subclass:**

All citizens of Kentucky who purchased any of the MIC Products.

**Colorado Subclass:**

All citizens of Colorado who purchased any of the MIC Products.

**Maryland Subclass:**

All citizens of Maryland who purchased any of the MIC Products.

**Illinois Subclass:**

All citizens of Illinois who purchased any of the MIC Products.

**North Carolina Subclass:**

All citizens of North Carolina who purchased any of the MIC Products.

**Washington Subclass:**

All citizens of Washington who purchased any of the MIC Products.

129.    Excluded from the Class are Defendant; its officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest in, is a parent or subsidiary of, or which is otherwise controlled by Defendant; and Defendant's affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees.  Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

130.    Plaintiffs reserve the right to modify and/or amend the Class definition, including but not limited to creating additional subclasses, as necessary.

131.    All members of the proposed Class are readily identifiable through Defendant's records.

132.    **Numerosity.**   The members of the Class are so numerous that joinder of all members of the Class is impracticable.  Upon information and belief, Plaintiffs believe that the proposed Class includes hundreds or thousands of people.  The precise number of Class members is unknown to Plaintiffs but may be ascertained from Defendant's records.

133.    **Commonality and Predominance.**  This action involves common questions of law and fact to the Plaintiffs and Class members, which predominate over any questions only affecting individual Class members.  These common legal and factual questions include, without limitation:

    a.    Whether Defendant engaged in unlawful, unfair, or deceptive business practices by advertising and selling the MIC Products;

    b.    Whether Defendant's conduct of advertising and selling the MIC Products as non-toxic and free from certain chemicals when they are not constitutes an unfair method of competition, or unfair or deceptive act or practice in

violation of various consumer protection laws and the warranties related to the products;

c.     Whether Defendant used deceptive representations and omissions in connection with the sale of the MIC Products in violation of various consumer protection laws and the warranties related to the products;

d.     Whether Defendant represented the MIC Products have characteristics or quantities that they do not have in violation of various consumer protection laws and the warranties related to the products;

e.     Whether Defendant advertised the MIC Products with the intent not to sell it as advertised in violation of various consumer protection laws and the warranties related to the products;

f.     Whether Defendant's labeling and advertising of the MIC Products is untrue or misleading in violation of various consumer protection laws and the warranties related to the products;

g.     Whether Defendant knew or by the exercise of reasonable care should have known its labeling and advertising was and is untrue or misleading in violation of various consumer protection laws and the warranties related to the products;

h.     Whether Plaintiffs and the Class purchased MIC Products they would not have purchased or paid more money for the MIC Products than they would have had Defendant not engaged in the misrepresentations and omissions described herein;

i.     Whether Defendant's conduct constitutes breach of express warranty;

    j.  Whether Plaintiffs and the Class are entitled to equitable and/or injunctive relief; and

    k.  Whether Defendant was unjustly enriched by its unlawful conduct.

134. **Typicality.** Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiffs on behalf of himself and the Class.  Defendant's unlawful, unfair, and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.  Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.  Plaintiffs' and the Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

135. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class and have retained counsel experienced in complex consumer class action litigation and intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of the Class.

136. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims.  There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

## CAUSES OF ACTION

### <u>COUNT I</u>
**Breach of Express Warranty**
*By Plaintiffs on behalf of the Nationwide Class*

137.    Plaintiffs reassert the allegations set forth previously and incorporate such allegations by reference herein.

138.    Each of the named Plaintiffs bring this cause of action against Defendant on behalf of the Nationwide Class.

139.    Express warranties by sellers of consumer goods are created when an affirmation of fact or promise is made by the seller to the buyer, which relates to the goods and becomes the basis of the bargain.  Such warranties can also be created based upon descriptions of the goods that are made as part of the basis of the bargain that the goods shall conform to the description.

140.    Each of the Plaintiffs formed a contract with Defendant at the time they purchased the MIC products.  The terms of that contract include the claims and affirmations of fact that Defendant made on the MIC product's packaging and through marketing and advertising, including, but not limited to, claims that the products are "non-toxic," "made without PFOAs," and other safety claims described above.

141.    The marketing and advertising constitute express warranties and became a part of the basis of the bargain, and they are part of the standardized contracts between Plaintiffs and Class Members on the one hand, and Defendant, on the other.

142.    In addition, or in the alternative, to the formation of an express contract, Defendant made each of their above-described representations, including the "non-toxic" and other safety claims described above, to induce Plaintiffs and Class Members to rely on such representations.

143.    Defendant's claims were material, and Plaintiffs and Nationwide Class Members

did rely and were reasonable in relying upon such representations in making their purchases of the MIC Products.

144.    Defendant has breached its express warranties about the MIC Products because the representations set forth herein, including the "non-toxic" and other safety claims described above, are false and misleading.

145.    Defendant failed to ensure that the material representations it made—and continues to make—to consumers were true.  As a result of this systemic failure of oversight to ensure the truthfulness of the representations of the product label and relevant marketing and advertising, consumers purchased the MIC Products from a company that fails to disclose or otherwise conceals that its products contain potentially hazardous chemicals, such as the PTFE coating.

146.    MIC failed to disclose or otherwise concealed the intentional inclusion of PTFE in the MIC Products on its website until August of 2023.

147.    Defendant cannot make the claims that its MIC Products are "non-toxic," "100% Safe," and/or "made without PFOAs" when it utilizes PFAS chemicals, such as PTFE, in the manufacturing of its MIC cookware.  Defendant cannot verify whether its "non-toxic" and "100% Safe" claims are accurate, nor did Defendant verify these claims through adequate oversight.  Accordingly, Defendant convinced consumers to purchase the MIC Products and ultimately charged consumers a price premium for express—but empty—promises.

148.    Defendant breached its express warranties about the MIC Products because the representations as set forth herein were false and misleading.

149.    Plaintiffs and Nationwide Class Members expected and would have been reasonable in expecting that Defendant ensure the statements on the MIC label and the relevant marketing and advertising for the product were truthful regarding its "non-toxic" and other safety

claims.  However, Plaintiffs and Nationwide Class Members have not received the benefit of their

bargain, as it has been discovered that Defendant's "non-toxic" and other safety claims are false

and misleading.

150.    As a result of Defendant's breach of its express warranties, Plaintiffs and the

Nationwide Class Members were damaged in an amount to be proven at trial.

151.    Plaintiffs, on behalf of themselves and Class Members, pray for relief as set forth

below.

## COUNT II
### Unjust Enrichment
*By Plaintiffs on behalf of the Nationwide Class*

152.    Plaintiffs reassert the allegations set forth previously and incorporate such

allegations by reference herein.

153.    Plaintiffs bring this claim for unjust enrichment against Defendant in the alternative

to their breach of express warranty claim.

154.    Plaintiffs and Nationwide Class members conferred benefits on Defendant by

purchasing the MIC Products, including by paying a price premium for the MIC Products.

155.    Defendant has been unjustly enriched by retaining the revenues derived from

Plaintiffs and the Nationwide Class Members' purchases of the MIC Products.  Retention of the

monies under these circumstances is unjust and inequitable because Defendant's labeling of the

MIC Products was misleading to consumers, which caused injuries to Plaintiffs and the

Nationwide Class Members because they would not have purchased or would have paid less for

the MIC Products if they had known the true facts regarding Defendant's "non-toxic" and other

safety claims, as described above.

156.    Because Defendant's retention of the non-gratuitous benefits conferred on them by

Plaintiffs and the Nationwide Class Members is unjust and inequitable, Plaintiffs and the Nationwide Class Members seek return of all monies Defendant acquired from its unlawful conduct, including disgorgement of all profits and establishment of a constructive trust.

157.     Therefore, Plaintiffs pray for relief as set forth below.

**COUNT III**
**Negligent Misrepresentation**
*By Plaintiffs on behalf of the Nationwide Class*

158.     Plaintiffs reassert the allegations set forth previously and incorporate such allegations by reference herein.

159.     Defendant represented to Plaintiffs and the Class Members that its MIC Products were "non-toxic," "made without PFOAs," and other safety claims outlined above.

160.     At the time Defendant made these representations, it knew or should have known that these representations were false, misleading to consumers, or otherwise made without knowledge of their truth or veracity.

161.     At a minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the MIC Products.

162.     The negligent misrepresentations and omissions Defendant made, upon which Plaintiffs and the Class Members reasonably and justifiably relied, were intended to induce and actually did induce Plaintiffs and the Class Members to purchase the MIC Products.

163.     Plaintiffs and the Class Members would not have purchased the MIC Products or would have purchased the MIC Products under different terms, if the true facts had been known.

164.     Defendant's negligent actions caused harm to Plaintiffs and the Class Members, who are entitled to damages and other legal and equitable relief as a result.

**COUNT IV**
**Violation of the California Consumer Legal Remedies Act**
**California Civil Code § 1750,** *et seq.*
*By Plaintiff Bojorquez on behalf of the California Subclass*

165.    Plaintiff Bojorquez reasserts the allegations set forth previously and incorporates such allegations by reference herein.

166.    This cause of action is brought pursuant to the California Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* ("CLRA"), by Plaintiff Bojorquez on behalf of the California Subclass (collectively, "Plaintiff and Class Members," for the purposes of this claim for relief).

167.    Defendant's actions, representations, omissions, and conduct have violated, and continue to violate the CLRA because they extend to transactions that are intended to result, or which have resulted, in the sale of goods to consumers.

168.    Plaintiff and the other Class Members are "consumers" as that term is defined by the CLRA.[63]

169.    The products that Plaintiff and Class Members purchased are "goods" within the meaning of the CLRA.[64]

170.    By engaging in the actions, representations, and conduct set forth in this Class Action Complaint, as described above, Defendant has violated, and continues to violate §§ 1770(a)(4), 1770(a)(5), 1770(a)(7), and 1770(a)(9) of the CLRA.  In violation of California Civil Code § 1770(a)(4), Defendant used deceptive representations in connection with goods.  In violation of California Civil Code § 1770(a)(5), Defendant represented that goods have approval, characteristics, uses, benefits, and qualities that they do not have.  In violation of California Civil

---

[63] CAL. CIV. CODE § 1761(d).
[64] *Id.* § 1761(a).

Code § 1770(a)(7), Defendant's acts and practices constitute improper representations that the goods and/or services it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code § 1770(a)(9), Defendant advertised goods with intent not to sell them as advertised.

171. Specifically, Defendant's acts and practices led consumers to believe that the MIC Products were, variously and without limitation, "non-toxic," "100% Safe," and "made without PFOAs," when in fact, the products contain a PTFE chemical coating. Defendant additionally made false and/or deceptive representations and statements (by omission and commission) that led reasonable consumers to believe that the products were safe for their health and constructed without harmful chemicals, such as PFOA and, prior to August of 2023, PTFE.

172. Further, Defendant omitted material facts that it had a duty to disclose, as alleged above. Specifically, prior to August of 2023, MIC failed to disclose on its website that its non-stick coating contained PTFE, which is a PFAS. Additionally, PFOAs and other PFAS are used to manufacturer PTFE.

173. Defendant's concealment of the true characteristics of the products was material to Plaintiff and Class Members. Had they known the truth, Plaintiff and Class Members would not have purchased the products or would have paid significantly less for them.

174. Defendant, as explained above, had an ongoing duty to Plaintiff and Class Members to refrain from unfair and deceptive practices under the CLRA. Specifically, Defendant owed Plaintiff and Class Members a duty to disclose material facts concerning the products because it possessed exclusive knowledge, it intentionally concealed them from Plaintiff and Class Members, and/or it made partial representations that were misleading since it concealed the aforementioned facts.

175.    Plaintiff and Class Members had no reasonable means of learning the facts that Defendant has concealed or failed to disclose because they were unaware of the manufacturing process for Defendant's products.  Furthermore, Defendant misrepresented, or at least omitted, a key part of that manufacturing process, which was the introduction of synthetic chemicals to the cookware.

176.    Plaintiff and Class Members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

177.    Plaintiff requests that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to the CLRA.[65]  If Defendant is not restrained from engaging in these types of practices in the future, Plaintiff and other Class Members will continue to suffer harm.

## COUNT V
**Violation of the California False Advertising Law**
**California Business and Professions Code § 17500, *et seq*.**
*By Plaintiff Bojorquez on behalf of the California Subclass*

178.    Plaintiff Bojorquez reasserts the allegations set forth previously and incorporates such allegations by reference herein.

179.    This cause of action is brought pursuant to the California False Advertising Law, California Business and Professions Code § 17500, *et seq.* ("FAL"), by Plaintiff Bojorquez on behalf of the California Subclass (collectively, "Plaintiff and Class Members," for the purposes of this claim for relief).

180.    Beginning at an exact date unknown to Plaintiff, but since at least as early as the time of the first Plaintiff's purchase and continuing until today, Defendant made untrue, false,

---

[65] *Id.* § 1780(a)(3).

deceptive and/or misleading statements in connection with the advertising and marketing of the MIC Products, and, in particular, those advertised as, variously and without limitation, "non-toxic" and "made without PFOAs."

181.    As set forth herein, Defendant has made representations and statements (by omission and commission) that led reasonable consumers to believe that that the MIC Products were, variously and without limitation, "non-toxic," "100% Safe," and "made without PFOAs," when in fact, the products contain a PTFE chemical coating.  Defendant additionally made false and/or deceptive representations and statements (by omission and commission) that led reasonable consumers to believe that the products were safe for their health and constructed without harmful chemicals, such as PFOA and, prior to August of 2023, PTFE.

182.    Further, Defendant omitted material facts that it had a duty to disclose, as alleged above.  Specifically, prior to August of 2023, MIC failed to disclose on its website that its non-stick coating contained PTFE, which is a PFAS.  Additionally, PFOAs and other PFAS are used to manufacturer PTFE.

183.    Plaintiff and Class Members relied to their detriment on Defendant's false, misleading, and deceptive advertising and marketing practices.  Had Plaintiff and Class Members been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, paying less for the MIC Products.

184.    Defendant's acts and omissions were likely to deceive the general public.

185.    Defendant engaged in these false, misleading, and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising in violation of the FAL.

186.    The aforementioned practices, which Defendant has used, and continues to use, to

its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

187.    Plaintiff seeks, on behalf of herself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.  Even for those who did not buy the MIC Products directly from Defendant, a certain amount of money flowed from Class Members who purchased the products through retailers to Defendant.  Plaintiff seek restitution of all amounts so recoverable.

188.    If Plaintiff and Class Members claims at law fail, Plaintiff, those similarly situated, and/or other consumers will have no adequate remedy at law by which they can obtain recovery for the economic harm they have suffered.  Plaintiff seeks, on behalf of herself and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein.

189.    Plaintiff and Class Members are further entitled to and do seek both a declaration that the above-described practices constitute false, misleading, and deceptive advertising, and injunctive relief restraining Defendant from engaging in any such advertising and marketing practices in the future.  Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which Defendant is not entitled.  Plaintiff, those similarly situated

and/or other consumers have no other adequate remedy at law to ensure future compliance with the FAL alleged to have been violated herein.

190.    As a direct and proximate result of such actions, Plaintiff and the Class Members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial.

**COUNT VI**
**Violation of the California Unfair Competition Law**
**California Business and Professions Code § 17200, *et seq*.**
*By Plaintiff Bojorquez on behalf of the California Subclass*

191.    Plaintiff Bojorquez reasserts the allegations set forth previously and incorporates such allegations by reference herein.

192.    This cause of action is brought pursuant to the California Unfair Competition Law, California Civil Code § 17200, *et seq.* ("UCL"), by Plaintiff Bojorquez on behalf of the California Subclass (collectively, "Plaintiff and Class Members," for the purposes of this claim for relief).

193.    Defendant has engaged in, and continues to engage in, unfair, unlawful, and deceptive trade practices in California by carrying out the unfair, deceptive and unlawful business practices outlined in this Class Action Complaint. In particular, Defendant has engaged in, and continues to engage in, unfair, unlawful and deceptive trade practices by, without limitation, the following:

a.    engaging in misrepresentation and omissions as described herein;

b.    violating the CLRA as described herein;

c.    violating the FAL as described herein;

d.    violating the California Safer Food Packaging and Cookware Act, California Health and Safety Code § 109010, *et seq.* ("SFPCA"), as described herein.

194.    Defendant, in its marketing, advertising, and labeling of the MIC Products, made false and misleading statements and omissions regarding the quality and characteristics of the MIC Products, specifically, marketing and labeling the MIC Products as "non-toxic" and "made without PFOAs" and other safety claims described above when the MIC Products are actually manufactured with a synthetic chemical coating of PTFE.  Such claims and omissions appear on the label of the MIC Products, product descriptions on online stores such as Amazon, Defendant's official website, and other advertisements.

195.    Plaintiff and Class Members relied to their detriment on Defendant's unfair, deceptive, and unlawful business practices.  Had Plaintiff and Class Members been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation, not paying for, or, at a minimum, paying less for the MIC Products.

196.    Defendant's labeling, marketing, and advertising of the MIC Products led to, and continue to lead to, reasonable consumers, including Plaintiff and Class Members, believing that the MIC Products are "non-toxic," "made without PFOAs," and in conformity with other safety claims as described above.

197.    The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."[66]

198.    Defendant does not have any reasonable basis for the claims about the MIC Products made in Defendant's marketing, advertising, and on Defendant's packaging or labeling because the MIC Products are not free from potentially hazardous and toxic substances, such as PFAS chemicals like PTFE.  Defendant knew or should have known that the MIC Products are not

---

[66] CAL. BUS. & PROF. CODE § 17200.

"non-toxic," "100% Safe," "made without PFOAs," or free from hazardous synthetic chemicals of the same family as PFOAs, such as PTFE, yet Defendant intentionally advertised and marketed the MIC Products to deceive reasonable consumers into believe that the MIC Products conformed to Defendant's safety representations, as described above.

199.    In addition, Defendant's use of various forms of marketing and advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue, or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code §§ 17200 and 17531.

200.    Defendant engaged in these unlawful, deceptive, and unfair practices to increase its profits.  Accordingly, Defendant has engaged in unlawful trade practices prohibited by the UCL.

201.    Defendant failed to avail itself of reasonably available, lawful alternatives to further its legitimate business interests.

202.    Defendant has engaged in unfair practices by violating the SFPCA, which provides, "a manufacturer shall not make a claim that the cookware is free of any specific chemical if the chemical belongs to a chemical group or class identified on the designated list, unless no individual chemical from that chemical group or class is intentionally added to the cookware."[67]  Defendant represents that the MIC Products are "non-toxic" and "made without PFOAs"; however, the MIC Products, in fact, contain a synthetic chemical coating of PTFE, a chemical of the same family as PFOAs and PFAS substances, each of which are included on the California Department of Toxic Substances Control's designated list.

203.    In addition to the unlawful and deceptive acts described above, Defendant engaged

---

[67] CAL. HEALTH & SAFETY CODE § 109013.

in unfair practices by violating the Federal Trade Commission's guides against bait advertising. 16 C.F.R. §§ 238.1–4.  The policy provides that "No statement or illustration should be used in any advertisement which creates a false impression of the grade, quality, make, value, currency of model, size, color, usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another."[68]  Defendant's aforementioned acts violated this policy, including its representations that the MIC Products are "non-toxic," "made without PFOAs," and other safety claims described above.

204.    The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provides an unlawful advantage over Defendant's competitors as well as injury to the general public.

205.    As a direct and proximate result of such actions, Plaintiff and the Class Members have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial.

206.    The injuries to Plaintiff and Class Members resulting from Defendant's unfair business practices outweigh any benefits.  Defendant's actions of marketing, advertising, and labeling the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs" does not confer any benefit to consumers when the consumers do not receive products commensurate with the consumers' reasonable expectations engendered by such false, misleading, and deceptive marketing and labeling.  Consumers cannot reasonably avoid the injuries caused by Defendant's deceptive labeling and advertising of the MIC Products.  Accordingly, the injuries caused by

---

[68] 16 C.F.R. § 238.2(a).

Defendant's deceptive labeling, marketing, and advertising outweigh any benefits.

207. Plaintiff and the Class are entitled to restitution under this statute. If Plaintiff's and Class Members' claims at law fail, Plaintiff, those similarly situated and/or other consumers will have no adequate remedy at law by which they can obtain recovery for the economic harm they have suffered.

208. Plaintiff seeks, on behalf of herself and those similarly situated, an injunction to prohibit Defendant from marketing and/or advertising the Products, as described above, within a reasonable time after entry of judgment. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it was not entitled. Plaintiff, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

### <u>COUNT VII</u>
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 ILCS 505/1,** *et seq.*
*By Plaintiffs Dorosheff and Estey on behalf of the Illinois Subclass*

209. Plaintiffs Dorosheff and Estey ("Plaintiffs," for purposes of this Count), individually and on behalf of the Illinois Subclass, repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

210. Defendant is a "person" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

211. Plaintiffs and Illinois Subclass Members are "consumers" as defined by 815 Ill. Comp. Stat. §§ 505/1(e).

212.     Defendant's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

213.     Defendant's deceptive, unfair, and unlawful trade acts or practices, in violation of 815 Ill. Comp. Stat. § 505/2, included representing that the MIC Products had the sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities, that the MIC Products does not have.

214.     Defendant also deceptively labeled the MIC Products as "non-toxic," "100% Safe," "made without PFOAs," and with similar claims identified above to confuse and deceive consumers.

215.     By disseminating materially misleading and deceptive representations and statements throughout Illinois to consumers, including Plaintiffs and members of the Illinois Subclass, Defendant was likely to deceive reasonable consumers in violation of § 505.

216.     Defendant's deceptive practices were specifically designed to induce reasonable consumers like Plaintiffs to purchase the MIC Products.   Defendant's uniform, material representations and omissions regarding the MIC Products were likely to deceive and did deceive consumers.   Defendant knew or should have known that its uniform representations, as alleged herein, were untrue or misleading.

217.     Plaintiffs and the Illinois Subclass purchased the MIC Products in reliance on the representations made by Defendant, as alleged herein.   Defendant intended to mislead Plaintiffs and Illinois Subclass Members and to induce them to rely on its misrepresentations and omissions.

218.     Defendant's unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous.   These acts caused substantial injury that these consumers could not

reasonably avoid.  The resulting injury to Plaintiffs outweighed any benefits to consumers or to competition.

219.    Defendant acted intentionally, knowingly, and maliciously to violate Illinois's Consumer Fraud Act, and recklessly disregarded Plaintiffs and Illinois Subclass Members' rights.

220.    Defendant continues to engage in the unlawful, unfair, and deceptive practices in violation of § 505.

221.    Plaintiffs and members of the Illinois Subclass have been directly and proximately injured by Defendant's conduct in ways including, but not limited to, the monies paid to Defendant for the MIC Products that lacked the characteristics advertised, interest lost on those monies, and consumers' unwitting support of a business enterprise that promotes deception and undue greed to the detriment of consumers, such as Plaintiffs and Illinois Subclass members.

222.    As a direct and proximate result of Defendant's unlawful conduct in violation of § 505, Plaintiffs and members of the Illinois Subclass are entitled to an order of this Court enjoining such future wrongful conduct and requiring Defendant to disclose the true nature of its misrepresentations.

223.    Plaintiffs and Illinois Subclass Members also seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT VIII
### Violation of Illinois Uniform Deceptive Trade Practices Act
### 815 ILCS 510/2, *et seq.*
*By Plaintiffs Dorosheff and Estey on behalf of the Illinois Subclass*

224.    Plaintiffs Dorosheff and Estey ("Plaintiffs," for purposes of this Count), individually and on behalf of the Illinois Subclass, repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

225.   Defendant is a "person" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

226.   Defendant engaged in deceptive trade practices in the conduct of its business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including by:

a.   Representing that goods or services have characteristics that they do not have;

b.   Representing that goods or services are of a particular standard, quality, or grade if they are of another;

c.   Advertising goods or services with intent not to sell them as advertised; and

d.   Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

227.   Defendant's act of marketing and labeling the MIC Products as "non-toxic," "100% Safe," "made without PFOAs," and with other similar statement identified herein, when they are actually harmful to the environment and cause injuries to consumers was unfair and deceptive because consumers did not receive products commensurate with the consumers' reasonable expectations.

228.   Defendant's action of marketing and labeling the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs" when they are actually harmful to the environment and cause injuries to consumers is unfair and deceptive because consumers end up overpaying for the MIC Products and receiving a product of lesser standards than what they reasonably expected and bargained to receive.

229.   Consumers could not avoid any of these injuries caused by Defendant's deceptive labeling and advertising of the MIC Products.   Accordingly, the injuries Defendant caused outweigh any possible benefit conferred by Defendant's practices in marketing, advertising, and labeling the MIC Products.

230.    Defendant's environmental and safety claims, as described herein, were false, misleading, and unreasonable, and constituted unfair and deceptive conduct.  Defendant knew or should have known of its unfair and deceptive conduct.

231.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

232.    The unfair and deceptive practices and acts by Defendant described herein were immoral, unethical, oppressive, and unscrupulous.   These acts caused substantial injury to Plaintiffs and Illinois Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

233.    Plaintiffs and the Illinois Subclass suffered injury in fact and lost money as a result of Defendant's unfair conduct.  Plaintiffs and the Class paid an unwarranted premium for the MIC Products, or otherwise bargained for a product they did not receive.

234.    Plaintiffs and the Class would not have purchased the MIC Products, would have paid substantially less for the MIC Products, or purchased the MIC Products under different terms, if they had known that the MIC Products' advertising and labeling were deceptive.

235.    As a direct and proximate result of Defendant's unfair, unlawful, and deceptive trade practices, Plaintiffs and Illinois Subclass Members have suffered and will continue to suffer injury and damages.

236.    Plaintiffs and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorneys' fees.

**COUNT IX**
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. Ann. § 75-1.1, *et seq.***
*By Plaintiff Schmidt on behalf of the North Carolina Subclass*

237.    Plaintiff Schmidt ("Plaintiff," for purposes of this Count), individually and on

behalf of the North Carolina Subclass, repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

238.   Through its marketing, advertising, and labeling of the MIC Products, Defendant engaged in unfair or deceptive acts or practices in or affecting commerce, in violation of the North Carolina Unfair and Deceptive Trade Practices Act ("N.C. UDTPA"), N.C. Gen. Stat. Ann. § 75-1.1, by making false and misleading statements and omissions regarding the quality and characteristics of the MIC Products, specifically, marketing and labeling the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs" and other safety claims described above when the MIC Products are actually manufactured with a synthetic chemical coating of PTFE. Such claims and omissions appear on the label of the MIC Products, product descriptions on online stores such as Amazon, Defendant's official website, and other advertisements.

239.   Section 16 of the N.C. UDTPA provides a private right of action for consumers, stating:

> If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff against the defendant for treble the amount fixed by the verdict.[69]

240.   Defendant's acts and practices were "unfair" because they caused or were likely to cause substantial injury to consumers which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

241.   Defendant's omissions and deceptive labeling of the MIC Products as "non-toxic," "100% Safe," "made without PFOAs," and other safety claims described further herein were

---

[69] N.C. GEN. STAT. ANN. § 75-16.

material because they were likely to deceive reasonable consumers about the safety and environmental benefits of the MIC Products.

242. The injury to consumers from Defendant's conduct was and is substantial because it was non-trivial, non-speculative, and involved a monetary injury and an unwarranted risk to the safety of consumers.

243. Plaintiff and the North Carolina Subclass Members could not have reasonably avoided injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding and/or misrepresenting that the MIC Products are "non-toxic," "100% Safe," and "made without PFOAs," Defendant created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

244. Plaintiff and North Carolina Subclass Members relied to their detriment on Defendant's unfair, deceptive, and unlawful business practices. Had Plaintiff and North Carolina Subclass Members been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation, not paying for, or, at a minimum, paying less for the MIC Products.

245. Defendant's labeling, marketing, and advertising of the MIC Products led to, and continue to lead to, reasonable consumers, including Plaintiff and North Carolina Subclass Members, believing that the MIC Products are "non-toxic," "100% Safe," "made without PFOAs," and in conformity with other safety claims as described above.

246. Defendant acted intentionally, knowingly, and maliciously to violate the N.C. UDTPA. Moreover, Defendant recklessly disregarded Plaintiff's and North Carolina Subclass Members' rights.

247.    Plaintiff and members of the North Carolina Subclass have been directly and proximately injured by Defendant's conduct in ways including, but not limited to, the monies paid to Defendant for the MIC Products that lacked the characteristics advertised, interest lost on those monies, and consumers' unwitting support of a business enterprise that promotes deception and undue greed to the detriment of consumers, such as Plaintiff and North Carolina Subclass members.

248.    Defendant's conduct as alleged herein was continuous, such that after the first violations of the N.C. UDTPA previously pled herein, each week that the violations continued constitute separate offenses under N.C. Gen. Stat. Ann. § 75-8.

249.    Plaintiff and North Carolina Subclass Members seek all relief allowed by law, including actual damages, treble damages, reasonable attorneys' fees and costs; injunctive relief; and punitive damages.

## COUNT X
### Violation of Colorado Consumer Protection Act
### Colo. Rev. Stat. §§ 6-1-101, *et seq.*
*By Plaintiff Dishman on behalf of the Colorado Subclass*

250.    Plaintiff Dishman ("Plaintiff," for purposes of this Count), individually and on behalf of the Colorado Subclass, repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

251.    Defendant is a "person" as defined by Colo. Rev. Stat. § 6-1-102(6).

252.    Defendant engaged in "sales" as defined by Colo. Rev. Stat. § 6-1-102(10).

253.    Plaintiff and Colorado Subclass Members, as well as the general public, are actual or potential consumers of the products and services offered by Defendant or successors in interest to actual consumers.

254.    Defendant engaged in deceptive trade practices in the course of its business, in

violation of Colo. Rev. Stat. § 6-1-105(1), including marketing and labeling the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs," when they contain a PTFE coating that is harmful to humans, animals, and the environment. Such deceptive representations cause injuries to consumers and are unfair and deceptive because consumers do not receive products commensurate with the consumers' reasonable expectations.

255.    Defendant's action of marketing and labeling the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs," when they contain a PTFE coating that is harmful to humans, animals, and the environment. Such deceptive representations cause injuries to consumers and are unfair and deceptive because consumers end up overpaying for the MIC Products and receiving products of lesser standards than what they reasonably expected and bargained to receive.

256.    Consumers cannot avoid any of these injuries caused by Defendant's deceptive labeling and advertising of the MIC Products.  Accordingly, the injuries Defendant caused outweigh any possibly benefit, if any exists, from Defendant's marketing program.

257.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

258.    Defendant intended to mislead Plaintiff and Colorado Subclass Members and induce them to rely on its misrepresentations and omissions.

259.    Defendant acted intentionally, knowingly, and maliciously to violate Colorado's Consumer Protection Act, and recklessly disregarded Plaintiff and Subclass Members' rights.

260.    As a direct and proximate result of Defendant's deceptive trade practices, Colorado Subclass Members suffered injuries and damages.

261.    Defendant's deceptive trade practices significantly impact the public because many

members of the public are actual or potential consumers of Defendant's products and Defendant's safety claims and other representations, as described above, impacted thousands of Americans, which include members of the Colorado Subclass.

262.    Plaintiff and Colorado Subclass Members seek all monetary and non-monetary relief allowed by law, including the greater of: (a) actual damages, or (b) $500, or (c) three times actual damages; injunctive relief; and reasonable attorneys' fees and costs.

### COUNT XI
**Violation of the New York General Business Law**
**N.Y. Gen. Bus. Law §§ 349, *et seq.***
*By Plaintiffs Refael and Luckadoo on behalf of the New York Subclass*

263.    Plaintiffs Refael and Luckadoo ("Plaintiffs," for purposes of this Count), individually and on behalf of the New York Subclass, repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

264.    Defendant engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349.

265.    As set forth herein, Defendant has made representations and statements (by omission and commission) that led reasonable consumers to believe that that the MIC Products were, variously and without limitation, "non-toxic," "100% Safe," and "made without PFOAs," when in fact, the products contain a PTFE chemical coating.  Defendant additionally made false and/or deceptive representations and statements (by omission and commission) that led reasonable consumers to believe that the products were safe for their health and constructed without harmful chemicals, such as PFOA and, prior to August of 2023, PTFE.

266.    Further, Defendant omitted material facts that it had a duty to disclose, as alleged above.  Specifically, prior to August of 2023, MIC failed to disclose on its website that its non-stick coating contained PTFE, which is a PFAS.  Additionally, PFOAs and other PFAS are used

to manufacturer PTFE.

267.    Defendant's action of marketing and labeling the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs" when they contain a PTFE coating that is harmful to humans, animals, and the environment. Such deceptive representations cause injuries to consumers and are unfair and deceptive because consumers do not receive products commensurate with the consumers' reasonable expectations.

268.    Defendant's action of marketing and labeling the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs" when they contain a PTFE coating that is harmful to humans, animals, and the environment.  Such deceptive representations cause injuries to consumers and are unfair and deceptive because consumers end up overpaying for the MIC Products and receiving Products of lesser standards than what they reasonably expected and bargained to receive.

269.    Consumers cannot avoid any of these injuries caused by Defendant's deceptive labeling and advertising of the MIC Products.  Accordingly, the injuries Defendant caused outweigh any possibly benefit, if any exists, from Defendant's marketing program.

270.    Defendant acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiffs' and New York Subclass Members' rights.

271.    As a direct and proximate result of Defendant's deceptive and unlawful acts and practices, Plaintiffs and New York Subclass Members have suffered and will continue to suffer injury and damages.

272.    Defendant's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the many New Yorkers.

273.     The above deceptive and unlawful practices and acts by Defendant caused substantial injury to Plaintiffs and New York Subclass Members that they could not reasonably avoid.

274.     Plaintiffs and the New York Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair conduct. Plaintiffs and the Class paid an unwarranted premium for these MIC Products, or otherwise bargained for a product they did not receive. Specifically, Plaintiffs and the New York Subclass paid for Products which they reasonably expected conformed to Defendant's representations as described herein, but which, in fact, contained PFAS chemicals such as PTFE. Plaintiffs and the New York Subclass would not have purchased the MIC Products, would have paid substantially less for the MIC Products, or would have purchased the MIC Products under different terms if they had known that the MIC Products' advertising and labeling were deceptive.

275.     Plaintiffs and New York Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

## COUNT XII
### Violation of the Washington Consumer Protection Act
### Wash. Rev. Code §§ 19.86.020, *et seq.*
*By Plaintiff Thompson on behalf of the Washington Subclass*

276.     Plaintiff Thompson ("Plaintiff," for purposes of this Count), individually and on behalf of the Washington Subclass, repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

277.     Defendant is a "person," as defined by Wash. Rev. Code § 19.86.010(1).

278.     Defendant advertised, offered, or sold the MIC Products or services in Washington to Washington consumers and engaged in trade or commerce directly or indirectly affecting the

people of Washington, as defined by Wash. Rev. Code § 19.86.010(2).

279.    Defendant engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, in violation Wash. Rev. Code § 19.86.010(2) including labeling and marketing the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs" when they contain a PTFE coating that is harmful to humans, animals, and the environment.  Such deceptive representations cause injuries to consumers and are unfair and deceptive because consumers do not receive products commensurate with the consumers' reasonable expectations.

280.    Defendant's action of labeling and marketing the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs" when they contain a PTFE coating that is harmful to humans, animals, and the environment. Such deceptive representations cause injuries to consumers and are unfair and deceptive because consumers end up overpaying for the MIC Products and receiving Products of lesser standards than what they reasonably expected and bargained to receive.

281.    Consumers cannot avoid any of these injuries caused by Defendant's deceptive labeling and advertising of the MIC Products.  Accordingly, the injuries Defendant caused outweigh any possibly benefit, if any exists, from Defendant's marketing program.

282.    Defendant's marketing and labeling of the MIC Products is false, misleading, and unreasonable, and constitutes unfair and deceptive conduct. Defendant knew or should have known of its unfair and deceptive conduct.

283.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

284.    The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and

Washington Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition, if any exist.

285.    Plaintiff and the Washington Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair conduct.  Plaintiff and the Class paid an unwarranted premium for these MIC Products, or otherwise bargained for a product they did not receive. Specifically, Plaintiff and the Washington Subclass paid for Products which they reasonably expected conformed to Defendant's representations as described herein, but which, in fact, contained PFAS chemicals such as PTFE. Plaintiff and the Washington Subclass would not have purchased the MIC Products, would have paid substantially less for the MIC Products, or would have purchased the MIC Products under different terms if they had known that the MIC Products' advertising and labeling were deceptive.

286.    As a direct and proximate result of Defendant's unfair, unlawful, and deceptive trade practices, Plaintiff and Washington Subclass Members have suffered and will continue to suffer injury and damages.

287.    Plaintiff and the Washington Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, injunctive relief, civil penalties, and attorneys' fees and costs.

### COUNT XIII
#### Violation of the Kentucky Consumer Protection Act
#### KRS §§ 367.110, *et seq.*
*By Plaintiff Mills on behalf of the Kentucky Subclass*

288.    Plaintiff Mills ("Plaintiff," for purposes of this Count), individually and on behalf of the Kentucky Subclass, repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

289.    The Commonwealth of Kentucky believes that "the public health, welfare and

interest require a strong and effective consumer protection program to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services."[70]

290.    In furtherance of this public policy objective, the Kentucky Consumer Protection Act (the "KCPA") was enacted in order to prevent "unfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce."[71]

291.    Defendant is engaged in trade or commerce as defined in the KCPA because it offered and continues to offer goods and services, such as the MIC Products, to the people of Kentucky, including Plaintiff and the Kentucky Subclass Members.

292.    Plaintiff has standing to bring this action under KRS § 367.220 because he entered into a contract with Defendant for the purchase of the MIC Products primarily for personal, family or household purposes.

293.    "Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" are unlawful pursuant to the KCPA.[72]

294.    Defendant engaged in unfair, false, misleading, or deceptive acts or practices or otherwise violated KCPA by, among other things, knowingly and intentionally advertising and labeling the MIC Products as "non-toxic," "100% Safe," "made without PFOAs," and other safety representations described herein, while, in fact, the MIC Products contain PFAS chemicals and a PTFE coating that are harmful to humans, animals, and the environment.

295.    Defendant's action of marketing and labeling the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs" when they contain a PTFE coating that is harmful to humans, animals, and the environment. Such deceptive representations cause injuries to consumers

---

[70] KRS § 367.120(1).
[71] *Id.* § 367.170(1).
[72] *Id.*

and are unfair and deceptive because consumers do not receive products commensurate with the consumers' reasonable expectations.

296.    Defendant's action of marketing and labeling the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs" when they contain a PTFE coating that is harmful to humans, animals, and the environment. Such deceptive representations cause injuries to consumers and are unfair and deceptive because consumers end up overpaying for the MIC Products and receiving Products of lesser standards than what they reasonably expected and bargained to receive.

297.    Plaintiff and the Kentucky Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair conduct. Plaintiff and the Kentucky Subclass paid an unwarranted premium for these MIC Products, or otherwise bargained for a product they did not receive.  Specifically, Plaintiff and the Kentucky Subclass paid for Products which they reasonably expected conformed to Defendant's representations as described herein, but which, in fact, contained PFAS chemicals such as PTFE.  Plaintiff and the Kentucky Subclass would not have purchased the MIC Products, would have paid substantially less for the MIC Products, or would have purchased the MIC Products under different terms if they had known that the MIC Products' advertising and labeling were deceptive.

298.    Plaintiff and Kentucky Subclass Members are entitled to damages, declaratory relief, injunctive relief, and attorneys' fees and costs.[73]

**COUNT XIV**
**Violation of the Maryland Consumer Protection Act**
**Md. Code Ann., Comm. Law §§ 13-101, *et seq.***
*By Plaintiff Elseroad on behalf of the Maryland Subclass*

299.    Plaintiff Elseroad ("Plaintiff," for purposes of this Count), individually and on

---

[73] *Id.* § 367.220.

behalf of the Maryland Subclass, repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

300.    Plaintiff brings this claim pursuant to the Maryland Consumer Protection Act, Md. Code Ann., Comm. Law § 13-101, *et seq*. ("MCPA").

301.    Defendant, Plaintiff, and the Maryland Subclass Members are "persons" within the meaning of Md. Code Ann., Comm. Law § 13-101(h).

302.    The MCPA provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good.[74]  Defendant participated in misleading, false, or deceptive acts that violated the MCPA.

303.    In the course of Defendant's business, Defendant engaged in unfair, false, misleading, or deceptive acts or practices or otherwise violated MCPA by, among other things, knowingly and intentionally advertising and labeling the MIC Products as "non-toxic," "100% Safe," "made without PFOAs," and other safety representations described herein, while, in fact, the MIC Products contain PFAS chemicals and a PTFE coating that are harmful to humans, animals, and the environment.

304.    Defendant's action of marketing and labeling the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs" when they contain a PTFE coating that is harmful to humans, animals, and the environment. Such deceptive representations cause injuries to consumers and are unfair and deceptive because consumers do not receive products commensurate with the consumers' reasonable expectations.

305.    Defendant's action of marketing and labeling the MIC Products as "non-toxic," "100% Safe," and "made without PFOAs" when they contain a PTFE coating that is harmful to

---

[74] MD. CODE ANN., COMM. LAW § 13-303.

humans, animals, and the environment. Such deceptive representations cause injuries to consumers and are unfair and deceptive because consumers end up overpaying for the MIC Products and receiving Products of lesser standards than what they reasonably expected and bargained to receive.

306.    Consumers cannot avoid any of these injuries caused by Defendant's deceptive labeling and advertising of the MIC Products.  Accordingly, the injuries Defendant caused outweigh any possibly benefit, if any exists, from Defendant's marketing program.

307.    Defendant's actions as set forth above occurred in the conduct of trade or commerce.

308.    The MCPA provides that "[t]his title shall be construed and applied liberally to promote its purpose. It is the intent of the General Assembly that in construing the term 'unfair or deceptive trade practices', due consideration and weight be given to the interpretations of §5(a)(1) of the Federal Trade Commission Act by the Federal Trade Commission and the federal courts."[75]

309.    At all times relevant to this action, Defendant was aware that the MIC Products included some harmful or unwanted chemicals that consumers would be concerned about, such as PTFE and PFAS chemicals, but still advertised the Products as "non-toxic," "100% Safe," and "made without PFOAs," which created confusion to consumers. Thus, Defendant acted intentionally and knowingly with regard to the unfair and deceptive marketing and labeling practices described herein and acted with an intent to mislead Plaintiff and the Maryland Subclass Members.

310.    Defendant knew or should have known that its conduct violated the MCPA.

311.    Defendant's representations and omissions were material because they were likely

---

[75] *Id.* § 13-105.

to deceive reasonable consumers. In fact, Defendant's representations and omissions did deceive consumers. These practices offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.

312.    Plaintiff and the Maryland Subclass Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendant's misrepresentations and omissions.

313.    Plaintiff and the Maryland Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair conduct. Plaintiff and the Maryland Subclass paid an unwarranted premium for these MIC Products, or otherwise bargained for a product they did not receive. Specifically, Plaintiff and the Maryland Subclass paid for Products which they reasonably expected conformed to Defendant's representations as described herein, but which, in fact, contained PFAS chemicals such as PTFE. Plaintiff and the Maryland Subclass would not have purchased the MIC Products, would have paid substantially less for the MIC Products, or would have purchased the MIC Products under different terms if they had known that the MIC Products' advertising and labeling were deceptive.

314.    Defendant had an ongoing duty to all of Defendant's customers to refrain from unfair and deceptive practices under the MCPA.

315.    Defendant's violations present a continuing risk of deception to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

316.    Pursuant to Md. Code ann., Comm. Law § 13-408, Plaintiff and Maryland Subclass Members seek actual damages, attorneys' fees, and any other just and proper relief available under the MCPA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor as follows:

a.  Certification the Class pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and an order that notice be provided to all Class Members;

b.  Designation of Plaintiffs as representatives of the Class and the undersigned counsel, Zimmerman Reed LLP and the Johnson Firm, as Class Counsel and Joe Kendall as Texas Local Counsel;

c.  An award of damages in an amount to be determined at trial or by this Court;

d.  An award of restitution and other equitable relief to be determined at trial or by this Court;

e.  An order for injunctive relief, enjoining Defendant from engaging in the wrongful and unlawful acts described herein;

f.  An award of statutory interest and penalties;

g.  An award of costs and attorneys' fees; and

h.  Such other relief the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  November 28, 2023   Respectfully submitted,

/s/ Joe Kendall
JOE KENDALL
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
214-744-3000 / 214-744-3015 (Facsimile)
jkendall@kendalllawgroup.com

Brian C. Gudmundson
(*pro hac vice* forthcoming)
Rachel K. Tack
(*pro hac vice* forthcoming)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
brian.gudmundson@zimmreed.com
rachel.tack@zimmreed.com

Christopher D. Jennings
(*pro hac vice* forthcoming)
Tyler B. Ewigleben
(*pro hac vice* forthcoming)
**JOHNSON FIRM**
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Telephone: (501) 372-1300
chris@yourattorney.com
tyler@yourattorney.com

***Attorneys for Plaintiff***